HAYECK BUILDING & REALTY CO. INC. *v.* FRANCIS E. TURCOTTE & another.

Worcester.   February 8, 1972. — May 11, 1972.

Present: CUTTER, SPIEGEL, REARDON, QUIRICO, & HENNESSEY, JJ.

*Contract,* Building contract, Performance and breach, Implied contract. *Damages,* Building project, Counsel fees.

A finding was warranted that failure of a subcontractor on a construction project to coat the inner side of a brick veneer wall with mortar to prevent moisture from penetrating to the inner concrete block wall, as required by the subcontract, did not constitute an intentional and substantial breach of the subcontract so as to bar recovery from the general contractor for work performed and materials supplied where there was evidence that the subcontractor in good faith followed different procedures because of requests by the general contractor and with the acquiescence of the general contractor, his foreman, and the architect. [789–790]

A finding was warranted that failure of a subcontractor on a construction project to use galvanized ties to tie a brick wall to an inner concrete wall as required by the subcontract was in good faith and unintentional and did not bar recovery from the general contractor for work performed and materials furnished where there was evidence that the subcontract also called for the use of a different device installed by the subcontractor which accomplished the same purpose and was normally the only device used, that use of the ties would have required that the intervening in-

sulation be scored, thereby partially defeating its purpose, and that the general contractor tacitly approved the manner of construction. [790–791]

Evidence respecting a claim by a subcontractor against the general contractor on a construction project warranted a finding that staining and streaking of face brick after the subcontractor washed it with a solution different from that called for in the subcontract but approved by the contractor was de minimis and did not bar recovery for work performed and materials furnished. [791–792]

Evidence respecting a claim by a subcontractor against the general contractor on a construction project warranted a finding that the subcontractor performed in a good and workmanlike manner the work of aligning courses of brick on one part of the project with those on another. [792]

A computation by the judge of $40,000 damages for a claim of a subcontractor on a construction project on *quantum meruit* against the general contractor was not erroneous where there was evidence that it would cost $50,000 to complete $109,000 of subcontract work, that other work done by the subcontractor was worth $14,000, that the subcontractor had already been paid $33,000 and that the subcontractor had left certain material he had purchased at the job site. [792–793]

BILL IN EQUITY filed in the Superior Court on December 31, 1968.

The suit was heard by *Lappin,* J.

*Edward J. Barshak* for the plaintiff.

*John E. Keenan, Jr.,* for the defendants.

HENNESSEY, J. This bill in equity was brought by Hayeck against Turcotte and his bonding company, Maryland Casualty Company, for breach of a construction subcontract. Turcotte filed an answer and a counterclaim for work, labor and materials furnished by him. Hayeck appeals from a final decree wherein the judge found for Turcotte in quantum meruit and awarded damages in the amount of $40,000. We have before us the judge's voluntary findings of facts and a transcript of the evidence.

The facts are here stated. Hayeck was awarded a contract by St. George Syrian Orthodox Church to construct a church, a hall and a classroom area. On May 9, 1968, Hayeck engaged Turcotte by written subcontract to do all the masonry work on the church and the hall. By a subsequent oral agreement, Turcotte agreed

to do the masonry work in the classroom area. In July, 1968, Turcotte went on the job site with a load of brick. At that time, the foundations were in but the electrical conduits had not yet been installed. Turcotte told Hayeck that he could not begin the masonry work until the electrical work was done.

About August 12, Turcotte went on the job site with plank and staging and, at that time, had a conversation with Hayeck concerning the use of buff colored mortar. Hayeck had selected buff colored brick and expressed some dissatisfaction with the use of gray mortar whereupon Turcotte built a sample wall using the buff colored mortar. Hayeck then agreed to the use of the buff colored mortar in both the church and the church wall. Between July 10, 1968, when the cement blocks were delivered to the job site, and the first week in August, Turcott told Hayeck that he wanted to begin the work but that the electrical work had not been done nor had the buff colored mortar arrived. Nevertheless, Hayeck told Turcotte to begin the block work because some of the parishioners were anxious to have the construction started.

On August 12, 1968, Turcotte commenced the block work on the church hall. The cement block wall was completely erected before any brick work was commenced. The subcontract required Turcotte to use a device known as a dur-O-wall and to tie the face masonry work to the backup work with approved galvanized ties. As the block wall was constructed, Turcotte installed the required dur-O-wall but did not install any of the galvanized ties. The subcontract further required Turcotte to parge[1] the inner face of the brick wall. Turcotte also failed to comply with the contract in this respect.

The judge warrantably found that during the construction of all of the masonry work, Hayeck and his foreman were on the site every day. The architect was

---

[1] Parging is the process whereby a coat of mortar is placed on the inner side of the brick veneer wall to prevent moisture from penetrating the outer wall and reaching the block wall.

also periodically on the job.   At no time did Hayeck, his foreman, or the architect object to Turcotte's placing of the dur-O-wall or to his failure to install the galvanized ties and to parge the brick wall.   Also, Hayeck never objected to erecting the entire block wall before beginning to erect the brick facing.

The subcontract required that upon completion of the exterior brick walls of the hall Turcotte wash them with a solution containing muriatic acid.   However, it was brought to Hayeck's attention not to use muriatic acid on the type of brick and mortar erected and, consequently, he instructed Turcotte's foreman to inquire of the brick supplier as to the proper solution.   As a result of his inquiries, Turcotte purchased a powder and washed a sample section of the wall.   After inspection and approval by Hayeck, the powder was used on the entire wall.   When the drying was completed, the exterior wall showed signs of streaking and discoloration.

Subsequently, Hayeck and Turcotte entered into an oral agreement for the masonry work on the classroom area.   The brick and wall construction which had been used on the church hall was also to be used in the construction of the classroom area except that a different detergent was used to wash the walls.   The masonry work on the classroom area was completed on September 30, 1968.

Turcotte did not begin the masonry work on the church until October 14, 1968, because the steel work had not been completed until October 10.   The masonry work was stopped on October 18 because the limestone window casings which were to be used on the building had not arrived.   Beginning at this time, there were several exchanges of letters and conferences between Hayeck and Turcotte, most of which dealt with the staining and streaking of the walls of the church hall.   As a result of these communications, the walls were again washed by Turcotte during the latter part of November and the early part of December.

Beginning on September 24, 1968, Turcotte submitted

to Hayeck invoices totaling $64,730. Except for a payment of $33,000 Hayeck refused to pay Turcotte until the latter corrected the appearance of the church hall. Turcotte, on the other hand, refused to go forward with any further work until he received payment. Finally, on December 12, 1968, Hayeck wrote Turcotte that he was terminating the subcontract and that Turcotte was in breach at that time.

On this appeal Hayeck argues that there was insufficient evidence to support the judge's findings and that the judge misapplied the law governing an award of damages based on quantum meruit where there has been a failure to comply with the requirements of a contract. We agree with Hayeck's contention that if Turcotte wilfully and in bad faith failed to comply with the specific terms of the subcontract, he would be precluded from recovering in quantum meruit. However, we conclude that the judge was warranted in finding that, in the circumstances here shown, Turcotte was not barred from recovery.

At the outset we observe that even where a transcript of the evidence is before us the "[f]indings made by a judge on oral testimony . . . are not to be reversed unless shown to be plainly wrong." *Barnum* v. *Fay*, 320 Mass. 177, 180, and cases cited.

1. The law in this Commonwealth with respect to building contracts is well settled. "[A] contractor cannot recover on the contract itself without showing complete and strict performance of all its terms, but . . . failing in such complete performance of the contract, he may recover on a *quantum meruit*, if he can prove both substantial performance of the contract and an endeavor on his part in good faith to perform fully, and the burden is upon him to prove both." *Andre* v. *Maguire*, 305 Mass. 515, 516, and cases cited. It is equally well established that "[a]n intentional departure from the terms of the contract without justification or excuse in matters other than those so trifling as to be properly regarded as falling within the rule of de minimis will bar all recov-

ery for materials supplied and work performed." *Russo*
v. *Charles I. Hosmer, Inc.* 312 Mass. 231, 233. *Divito* v.
*Uto,* 253 Mass. 239, 242–243.

2. Hayeck argues that Turcotte's failure to parge the
walls was an intentional and substantial breach of the
subcontract and that the judge's findings to the contrary
are plainly wrong. We disagree. There was expert
testimony that the common method of parging is to do
it from the rear, that is, the mason lays the face brick,
parges the brick from the rear, installs the insulation and
then brings the cement block wall up to the height of
the brick. In this case the block wall was completely
erected before the brick face wall was begun. The
evidence supports the judge's finding that this procedure
was followed "at the behest of Hayeck to indicate to the
parishioners that work was being accomplished on their
project." The judge also warrantably found that the
procedure was followed, in part, because of a delay in
receiving the buff colored mortar which, although not
called for by the original subcontract, had been requested
by Hayeck. Finally, there is evidence to support the
finding that the failure to parge was observed by Hayeck,
his foreman, and the architect and no objection was made
by them at any time.

In view of the common method of parging and the
manner in which the wall was constructed in this case,
the finding was warranted that parging would have been
more difficult, time-consuming and expensive than would
have been the case had the block wall not been com-
pletely erected. In view of this finding and in view of
the evidence that no objection was made by Hayeck, his
foreman, or the architect, the question whether Hayeck
waived the parging requirement was for the judge's
determination (*Carrig* v. *Earle,* 241 Mass. 530, 532;
see *Kauranen* v. *Mattaliana,* 347 Mass. 583, 585), and
his finding that the failure to parge was in good faith
and not intentional was supported by the evidence.
*Lantz* v. *Chandler,* 340 Mass. 348, 349.

3. Hayeck also argues that Turcotte's failure to use

galvanized ties was a wilful breach of the subcontract. On this issue, the judge found that "to have used such galvanized ties . . . would have required that the polyurethane [insulation] be scored to accommodate the galvanized ties and in doing so would partially defeat the purpose of the insulation, that is, to have a barrier between the outer brick wall and the block wall to prevent moisture and climate changes." The judge further found that Turcotte's failure to use the ties was in good faith and not intentional and that Hayeck tacitly approved of the manner in which the wall was being constructed. Our review of the evidence indicates that the judge's findings were not plainly wrong.

In addition to requiring galvanized ties, the subcontract also called for the use of a device known as dur-O-wall. According to a structural engineer hired by Hayeck, this device is used to tie the inner block wall to the outer brick wall and, as such, it performs substantially the same function as the galvanized ties. There was also expert testimony to the effect that in the construction of a cavity wall, such as the one in this case, both galvanized ties and dur-O-wall are not ordinarily used together. In fact, expert testimony indicated that it is normal practice in the trade to use only the dur-O-wall for support of a cavity wall. From this evidence, together with Hayeck's tacit approval of the manner of construction, the judge was warranted in concluding that Turcotte's failure to use the ties was in good faith and not an intentional breach of the subcontract.

4. Hayeck further argues that Turcotte washed the face brick with a solution which caused considerable staining and streaking and that such a condition was also a substantial and intentional breach of the subcontract. The judge found that the parties agreed not to wash the walls with muriatic acid as originally called for in the subcontract. Instead, Hayeck and Turcotte agreed on the use of another solution which had been recommended by the brick supplier and which was first used on a sample section of the wall. This section was

inspected and approved by Hayeck. On this evidence alone, the judge was warranted in concluding that the staining and streaking occurred through no fault of Turcotte and that Turcotte made a good faith attempt to clean the walls. Furthermore, the judge warrantably found that the staining and streaking "will blend and become less apparent with the passage of time and exposure to the elements" and that the condition "in no way affects the structural quality of the hall or the functional quality of the hall." On the evidence before us, the defect in the wall was clearly de minimis. See *Champy* v. *Merrimack Park Auto Theatre, Inc.* 312 Mass. 462, 463.

5. Hayeck argues that the masonry work on the brick veneer wall was not done in a good and workmanlike manner. Specifically, it argues that Turcotte utilized an improper method to align the courses of brick on the wall of the church with those on the wall of the classroom. We disagree.

The evidence indicates that there was a step up from the church to the classroom and that Turcotte placed a bed of mortar sufficient to have the courses of brick on the church coincide with those on the classroom. There was evidence that in order to deal with such a step up a bed of mortar or a split brick could be used but that use of a split brick was not consistent with good workmanship. There was other expert testimony that either approach provided the same structural strength. On the basis of this evidence, the judge was warranted in concluding as he did that Turcotte proceeded with the brick work in a good and workmanlike manner. The fact that Hayeck chose to have some of the masonry work redone does not, by itself, compel a finding that the work was done in a defective manner.

6. Hayeck argues that the judge's computation of damages was erroneous. We disagree. The award made by the judge was based on quantum meruit. He heard evidence concerning the fair market value of the work, the replacement value and the value of the work

yet to be done on the job. The subcontract provided that the total cost of the work to be done by Turcotte on the church and the hall amounted to $109,000. There was other evidence that it would cost $50,000 to complete the masonry work on the church. From all the evidence, the judge could warrantably conclude that the value of Turcotte's services on the church and the hall amounted to $59,000. On the evidence before him, the judge was also warranted in concluding that the fair market value of Turcotte's services on the classroom area was $14,000. In reaching his final award of $40,000, the judge deducted from the $73,000 due Turcotte an amount previously paid by Hayeck ($33,000). Further, there is no merit to Hayeck's contention that the judge, although stating that he did, failed to take into consideration Turcotte's failure to conform specifically to the requirements of the contract. The judge expressly stated that the award also included the value of certain material purchased by Turcotte and left at the job site.

7. Hayeck finally argues that the judge's finding that "at the time that Turcotte submitted each of the invoices, Hayeck had received his money from the Church for the work billed by Turcotte" is not supported by the evidence. We disagree. Our review of the record, including the relevant dates, convinces us that the judge's finding was warranted.

8. The decree, in paragraph 4, provides that Hayeck shall pay certain reasonable costs of trial to Turcotte. We construe this as a provision for payment only of the specific amounts mentioned therein, and not as a provision for payment of counsel fees.

9. We observe that, although the final decree dismisses the bill as against Maryland Casualty Company, it does not dispose of the bill as against Turcotte. See *Blume* v. *Oil-O-Chron, Inc.* 287 Mass. 52, 55. Accordingly, the final decree is to be modified by adding a provision dismissing the bill as against Turcotte. As so modified, the final decree is affirmed with costs of appeal.                                                *So ordered.*